IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Civil Action No.  09-cv-03042-WYD-KMT

CELESTE DOYLE,

     Plaintiff,

v.

DENVER DEPARTMENT OF HUMAN SERVICES,

     Defendant.

---

**ORDER ON SUMMARY JUDGMENT MOTIONS**

---

I.    <u>INTRODUCTION</u>

    THIS MATTER is before the Court on cross motions for summary judgment.

Defendant Denver Department of Human Services' ["DDHS"] Motion for Summary

Judgment and Memorandum of Law was filed on April 19, 2011.  A response was filed

on May 18, 2011, and a reply was filed on June 7, 2011.  Plaintiff Celeste Doyle's

["Plaintiff"] Motion for Summary Judgment was also filed on April 19, 2011.  A response

was filed on April 26, 2011, and a reply was filed on May 19, 2011.  For the reasons

stated below, DDHS' Motion for Summary Judgment is granted in part and denied in

part.  Plaintiff's Motion for Summary Judgment is denied.

II.    <u>FACTUAL BACKGROUND</u>

    The parties tendered voluminous facts and evidence in this case.  I have not

discussed every fact tendered by the parties, only those that are most material to my

findings.  I note, however, that I have reviewed and considered all the facts and

evidence in support of same.  In so doing, I have construed the evidence in the light most favorable to the nonmoving party in connection with my review of each motion. *Anaya v. Crossroads Managed Care Sys., Inc.*, 195 F.3d 584 (10th Cir. 1999).  Where the facts are unsupported by evidence, are argumentative and/or are conclusory, I have disregarded those facts.  Also, where the facts are undisputed or I did not feel it was necessary, I have not cited to the record.

Turning to the facts, Plaintiff is a 47 year-old woman of mixed race—African American/Hispanic.  (Pl.'s Aff., ¶ 1, Ex. 1 to Pl.'s Resp. to Def.'s Mot. for Summ. J. ["Pl.'s Resp."].  She is college educated and bilingual.  (*Id.*)

Plaintiff was employed by DDHS as an Information Technology Technician II with the Denver Family & Adult Services Division Colorado Benefits Management System Help Desk ["CBMS Help Desk"] for approximately one and a half years—from March 2005 to September 2006.  The CBMS Help Desk is an internal support team that provides technical assistance to DDHS staff and others who are experiencing problems with the state-wide CBMS database.  Plaintiff was one of five information technology technicians hired in May of 2006 to comprise the CBMS Help Desk Team.  Those five employees were Celeste Doyle, Paul Potts, Desiree Renaud, Betty Rooney and Gilbert Vigil.  Plaintiff was the only African American on the team.  Her supervisor on the CBMS Help Desk Team was Russell Friesen.

Plaintiff was originally hired as a contract employee.  On May 8, 2006, she was hired as a permanent employee with a six month probationary period.  One of the purposes of probationary periods is to give DDHS an opportunity to assess an

employee's skills and job performance before the employee attains career status within the City's personnel system. (Dixon Aff., ¶ 6, Ex. B to Def.'s Mot. for Summ. J. ["Def.'s Mot."][1]; *see also* Denver Career Service Rule 5-51, the language of which is set out in Plaintiff's Response to DDHS' Motion for Summary Judgment.)

Because of her probationary status, Plaintiff could be terminated "at any time for any reason and without cause". (Pl.'s Ex. N; *see also* Dixon Aff., ¶ 7, Ex. B to Def.'s Mot. [hereinafter "Dixon Aff."].) Career service employees, on the other hand, may be disciplined or terminated only "for cause". (Dixon Aff., ¶ 7.)

Plaintiff received no formal written evaluation of her performance during her employment with DDHS. While DDHS presents testimony from deputy manager Valerie Brooks that probationary employees do not receive such evaluations (Def.'s Ex. F), Plaintiff notes that Rule 5-53(A) of Denver's Code of Conduct states "Employee Performance during a probationary period shall be documented by probationary reports. (See Pl.'s Ex. S; *see also* Rule 5-53(B)(3) ("Other probationary appraisals: Supervisors are encouraged to continually appraise performance during the probationary period so that employees are fully informed of their progress.")

Valerie Brooks testified that while no formal written evaluations were given to probationary employees, verbal counseling and communication with these employees was expected from the supervisors. (Brooks' Depo. at 77, Pl.'s Ex. E.) Ms. Brooks also testified that performance expectations for probationary employees are outlined in

---

[1]  For ease of reference, Defendant's exhibits to its Motion for Summary Judgment will hereafter be referred to as "Def.'s Ex. __". Similarly, Plaintiff's exhibits to her Motion for Summary Judgment will be referred to as "Pl.'s Ex. __." If the exhibits are to a response or reply, this is so noted.

performance evaluations the employee receives upon starting the position, and that it was expected the employee's supervisor would meet with the employee on an ongoing basis to discuss any general issues or performance issues. (*Id.* at 77-78.) Further, she stated that probationary employees are given time and an opportunity to correct performance problems. (*Id.* at 78.)

Ms. Brooks' testimony was that the policy was not to just all of a sudden terminate a probationary employee upon the discovery of the performance problems. The supervisor was expected to have spent some time talking with the employee about issues that came up and any complaints about the employee. (Brooks' Depo. at 78, Pl.'s Ex. E.) She also testified that while there is no set time frame as to how long an employee is given to correct the problem and while a probationary employee can be terminated at any point, the policy was to talk to the employee at least a few times and make sure that they improve. (*Id.* at 79.) Finally, she stated that this policy is in place despite the general "at-will" nature of employment for a probationary employee. (*Id.*)

DDHS' employment records reveal that Plaintiff did not receive any disciplinary actions. While DDHS asserts progressive discipline is not an option for probationary employees (Def.'s Ex. R), Plaintiff points to Rule 5-51 of Denver's Code of Conduct which states "An employee serving employment probation . . . may be demoted to a position with less responsibility). (Pl.'s Ex S, see also Rule 5-52(B) in Ex. S—probation period may be extended.)

One of the other members of the Help Desk team—Paul Potts—was also a Technology Technician II working directly with Plaintiff. On July 13, 2006, Mr. Potts

drew a printed picture of Plaintiff.  (Pl.'s Ex. A.)  The cartoon depicts a woman labeled as "Celeste" on a bus that is titled "Special" and labeled "short bus."  Plaintiff contends that a "short bus" is commonly known to transport disabled children who are generally described as "retarded."  (Pl.'s Aff., ¶ 8 and n. 22, Ex. 1. to Pl.'s Resp.)  She also contends that the woman's lips and nose on the picture are accentuated which is a common stereotype of African-Americans.  (*Id.*)  The cartoon states, "by Paul Potts." (*Id.*)  Plaintiff taped the cartoon to the top of her cubicle for everyone to see.  (*Id.*)  She testified that she did so "in defiance to the actions of my co-workers in order to show them that despite their racially discriminatory words and actions, they were not getting to me, they were not hurting or affecting me."  (*Id.*)

On July 19, 2006, Plaintiff went to her supervisor, Russell Friesen, "with a written complaint that the illustration [by Paul Potts] was a demeaning, disability [sic] and racially derogatory cartoon of her."  (Pl.'s Ex. B at p. 5, numbered as page "80" at the bottom of the page[2]; Pl.'s Aff., ¶ 9, Ex. 1 to Pl.'s Resp.)  Mr. Friesen, in his own words, did "nothing" with Plaintiff's complaint.

On July 21, 2006, DDHS employee Angela Thomas went to the Human Resources office and spoke with Deb Arter, a Senior Personnel Analyst, about Mr. Potts' drawing.  She informed Ms. Arter that Plaintiff told her Mr. Potts put an *"inappropriate, racist email on Ms. Doyle's desk."*  Additionally, Ms. Thomas stated that Plaintiff told her that she had presented Russell Friesen with the picture and was told

---

[2]   The Investigation Report, which is attached to both summary judgment motions as Plaintiff's Exhibit B and Defendant's Exhibit E, will hereafter be referred to by the page numbers at the bottom of the report.

something along the lines of, *"Paul will be fired if this goes to HR, we will have to pull your stuff also, and that's just Paul's* way of joking."  Ms. Thomas also stated that Plaintiff informed her that Mr. Friesen told Plaintiff that if he moved forward with her complaint, it would probably affect her status on the team.

Ms. Arter then immediately called Mr. Friesen into her office to inquire about the matter.  According to a report prepared regarding the investigation of this case discussed in more detail below, Mr. Friesen admitted saying "something to the affect [sic] that if Ms. Doyle's complaint was pursued it might affect her job".  (Pl.'s Ex. B at 78.)  Mr. Friesen also said, however, that this statement was taken out of context.  (*Id.*)  He further stated that Plaintiff told him she wanted the drawing back as she did not want to pursue the matter nor did she want Mr. Friesen to talk to Mr. Potts about it.  (*Id.*)

On July 24, 2006, Deb Arter contacted Plaintiff to confirm what she had been told by Ms. Thomas and Mr. Friesen.  Plaintiff was asked to provide information regarding the drawing she had received.  She was hesitant to speak with Ms. Arter and wanted to know how she knew about the drawing.  Ms. Arter indicated that it did not matter who informed her about the drawing, but that she needed to follow up on the allegation.  Plaintiff stated that she did not want to lose her job, but she felt she would if she brought her allegation forward.

Plaintiff relayed to Ms. Arter that she perceived the picture from Mr. Potts as racist and discriminatory, and that she had gone to Mr. Friesen with the picture and other information about what was going on with her work group.  (Pl.'s Ex. B at 79.)

She felt she was being treated differently by her team members and that they were mean-spirited towards her.  (*Id.*)

Plaintiff also informed Ms. Arter that on the evening of July 21, 2006, DDHS Technology Services employee Charles Taylor told her that some time ago he overheard Paul Potts on his cell phone make the remark, "*yeah, all they hire here anymore are monkeys and niggers*."  However, Mr. Taylor, who is also African-American, did not substantiate this.  (Def.'s Ex. E at 142; Dixon Aff. ¶ 20, Def.'s Ex. B; Pl.'s Ex. B at 79 and 83.)  Mr. Taylor said that he heard Mr. Potts saying "something about black monkeys. . . He could have been talking about a television show as far as I know."  (Dixon Aff., ¶ 20, Def.'s Ex. B; Pl.'s Ex. B at 83.)  Whether Mr. Potts said this remark is a disputed issue of material fact.

Plaintiff also stated that her co-worker, Desiree Renaud, made the comment about Plaintiff to her team members, "if we don't bind together, we won't get rid of her." Plaintiff stated that she did not want anything done about this allegation because she felt it would make things worse and because she was a probationary employee.  Plaintiff also informed Ms. Arter that although Mr. Friesen indicated to his unit that they could pretty much come and go whenever they wanted as long as they put in their time, she believed that her leave reports would be looked at and her probation would be ended if she did that.  She also indicated that other team members were late all of the time.  Ms. Arter asked Plaintiff for any documentation regarding her allegations.  Plaintiff indicated that when she knew her supervisor, Russell Friesen, was not going to do anything about her claim of racial discrimination, she tore the documentation up but still

had the pieces.  Ms. Arter asked for whatever was salvageable and received the documents the same day.

On or about July 24, 2006 (the date is disputed in the record), Valerie Brooks got directly involved after being informed of the circumstances surrounding Mr. Potts' drawing of Plaintiff, and requested that the Human Resources Department perform an investigation.  (Pl.'s Ex. B at 79.)  The purpose of the investigation was to investigate Plaintiff's allegation of racial discrimination that occurred at the CBMS Help Desk and at DDHS and to review timesheet records for the CBMS Help Desk based on Plaintiff's comments that the other team members could come and go as they pleased or were late but that she was treated differently.  (*Id.* at 76, 79.)

In July and August, Tamara Dixon (nee Tyler), an analyst specialist in the HR department, conducted this investigation.  She is African-American.  The period of active investigation was from July 24, 2006 to August 2, 2006.  (Pl.'s Ex. B at 76.)  As a part of the investigation, Ms. Dixon prepared written questions for each witness, asked those questions during the interview, typed the witness' responses into her laptop computer during the interview, gave each witness his or her written statement to review for completeness and accuracy, advised each witness to make any additions, deletions, or modifications necessary to accurately reflect their responses, and then asked each witness to sign the written statements attesting to the completeness and accuracy of the responses given.

During the course of the investigation, Plaintiff brought a claim of retaliation to the Human Resources office.  She claimed that she was being retaliated against by Russell

Friesen and Desiree Renaud for being a witness to her complaints against Paul Potts.

(Pl.'s Ex. B at 79.)  Plaintiff provided a copy of a letter that she had given to Mr. Friesen,

dated July 18, 2006, complaining that her co-employees were "mean" to her because

they:

> "1) Re-do my work and take credit for it; 2) Say they would have preferred
> their former co-worker and friend got my job instead of me; 3) Call me crazy
> and retarded and draw illustrations depicting that; 4) Say that my perfume
> always stinks; 5) Monitor my work, when I'm not in my chair, when I'm in the
> women's restroom, etc.; 6) And attempt to sabotoge [sic] my work efforts by
> saying I don't know what I'm doing and someone else should do the inbox.
> Weeks ago, Karen suggested Desiree do the inbox and they're just not going
> to let that go. They's going to keep this up until they get their way.  They are
> so jealous and scared that I'm going to get access to more computer
> applications than them or that I'm going to appear smarter than them that
> they try to make me look bad just to make themselves look better."

(Def's Ex E at 92.)

Plaintiff admitted at her deposition that the letter dated July 18th was actually

typed before July 18th, and acknowledged that for weeks prior to the letter her co-

workers had been complaining about how she handled the inbox.  She also stated that

her co-workers were retaliating against her even before the Potts picture was drawn.

On July 24, 2006, Ms. Dixon interviewed Mr. Potts.  He stated that he did not

know what a short bus was until Plaintiff came in and said, "I've been acting like I'm on

the short bus" and explained what a short bus was.  He also stated that Plaintiff asked

him to draw the picture for her, asked him to sign it and that the picture was done in jest.

While Plaintiff admits that Mr. Potts made these statements, she denies that they

accurately reflect the facts of what happened.  In her deposition, when asked whether it

was true that Mr. Potts did not know what a short bus was, she responded:

> . . . that's not true. Mr. Potts drew it, and he described to me, This is a short bus, and I said, What do you mean by that, and that's why he wrote the word "short bus," at which time Desiree stated, You see, she's still too stupid to even understand that, Paul, so why don't you make it clear.

(Pl.'s Depo. at 321-22, Ex. 2 to Pl.'s Resp.)  She also was asked, "Isn't it true you asked Mr. Potts to draw the picture?", to which she responded, "Absolutely not".  (*Id.* at 322.)

On July 25, 2006, Valerie Brooks terminated Paul Potts because of his conduct related to drawing the caricature of Plaintiff.  She testified that she made the decision to terminate Mr. Potts, which was supported by the manager of the department.  (Brooks' Depo. at 57, Def.'s Ex. F.)  Ms. Brooks testified that she terminated Mr. Potts because he was a probationary employee, because Plaintiff viewed the drawing as offensive and discriminating, and because Ms. Brooks viewed the drawing as inappropriate and potentially demeaning because it could suggest that someone on the "short bus" wasn't very bright.  (*Id.* at 57-59, 141, 143.)  The termination letter from Ms. Brooks to Mr. Potts stated in relevant part:

> "This dismissal during probation is the result of violation of Career Service Authority Rule 15-100 Harassment and/or Discrimination, Denver Human Resources policies and procedures regarding Workplace Harassment, CSA Rule 16-60 sections M. Threatening, fighting with, intimidating, or abusing employees or officers of the City, or any other member of the public, for any reason, O. Failure to maintain satisfactory working relationships with co-workers, other City employees, or the public, R. Discrimination or harassment of any employee or officer of the City because of race, color, religion, national origin, sex, age, political affiliation, sexual orientation or disability...."

(Pl.'s Ex. C.)

Ms. Brooks testified that she did not view the drawing as racist, but stated that if an employee feels that it is racist she has to respond to that.  (Brooks' Depo. at 59,

Def.'s Ex. F.)  She also did not find it offensive based on race, gender or disability.  (*Id.* at 143.)  She acknowledged, however, that some people could think that the illustration was discriminatory based on race.  (*Id.* 142.)  While Ms. Brooks was not normally involved in firing employees, she testified she terminated Mr. Potts because Mr. Friesen, the supervisor, was not in that week or was on vacation.  (*Id.* at 19; Brooks' Depo. at 45, Ex. J to Def.'s Reply.)  Plaintiff disputes Ms. Brooks' stated reason for being involved with the termination of Mr. Potts, arguing it is not credible.

On July 25, 2006, Ms. Brooks held a meeting with the CBMS Help Desk team members and informed them that Mr. Potts would not be back.  During that meeting, Desiree Renaud, a fellow CBMS Help Desk employee, did not respond well to the news and became insubordinate with Ms. Brooks.  As a result, Ms. Brooks terminated Ms. Renaud's probationary employment on July 26, 2006.

Also on July 26, 2006, Ms. Dixon interviewed Plaintiff.  Plaintiff reported that on or about July 13, 2006, her co-worker Paul Potts drew a picture of her on a "short bus" and made reference to her being crazy.  Ms. Dixon asked Plaintiff if she received the picture and to explain it to her in as much detail as possible.  (Def.'s Ex. E at 103.)  Plaintiff responded that she had received the picture.  She also stated:

> My coworker Paul Potts made a reference to me being crazy. I said what do you mean crazy as in 'hey girl crazy" or mental health crazy as in riding a short bus. He said the 2nd one, retarded crazy. He said - - I'm going to show you, hold that thought. He had me come over and he showed me the picture he was drawing and said we all think you're crazy. I said that's not funny. He was laughing. I said that's not me, I wear my earrings and stuff. So he added the earrings and colored in the bus. He said this is you and he said here take it. I told him to sign it for me. I said "What am I supposed to do with this?" He said take and keep it. I'm going to be famous one day. He was the only one

> in the cubicle. Others were laughing. I hung it up on my cabinet . Desiree was passing Paul's cubicle and I showed it to her and Desiree laughed too.

(*Id.*)  Ms. Dixon also asked Plaintiff if she asked Paul Potts to draw the picture to which Plaintiff responded "No."  (*Id.*)  Plaintiff was also interviewed on July 28, 2006.  (*Id.* at 106-07.)

On July 27, 2006, Ms. Dixon interviewed Diana Rodgers, an African American woman, who stated that Plaintiff had shown her the Paul Potts drawing.  When asked her reaction to the drawing, Ms. Rodgers stated, "To me it was just a picture.  I didn't concentrate on the nose, or the face.  To tell the truth I didn't see anything racially discriminatory about it."

During the investigation, Plaintiff was asked, "Do you feel that anyone has displayed racial discrimination toward you?"  Plaintiff responded:

"Yes.  Karen (who is gone), Desiree Renaud, Bettie Roney and Paul Potts. . . ."  Plaintiff also testified that Ms. Renaud and Ms. Roney had a conversation in her presence.  They called Plaintiff the "N" word, "Spic" and a "Hispanigger" which, according to Plaintiff, is a made-up term referring to a person of mixed African-American and Hispanic heritage.  (Pl.'s Depo. at 356, Def.'s Ex. G.)  There is a genuine issue of material fact as to whether Plaintiff reported this fact to Ms. Dixon in the investigation.

On August 1, 2006, Ms. Brooks had a series of e-mail exchanges with HR Director Jennifer Fairweather discussing what to do with Mr. Friesen, who wanted to be removed as supervisor of the Help Desk because he stated he did not feel he could

continue to supervise Plaintiff.  Kevin Patterson, the other deputy manager, was cc'd on these emails.  (Pl.'s Ex. F.)

On August 1 or 2, 2006, Valerie Brooks removed Mr. Friesen as the supervisor of the CBMS Help Desk Team and transferred him to a different position.  She stated in her deposition that she transferred him because there had been complaints about timekeeping issues (that he allowed his employees to come and go without good documentation on their time sheets) and discrimination (that he had not handled the situation with the Potts' drawing the way he should have.)  (Brooks' Depo. at 83, Def.'s Ex. F.)

While DDHS asserts that Mr. Friesen was transferred to another work area, Plaintiff disputes this in her Affidavit, stating that Mr. Friesen was removed and transferred as supervisor of the CBMS Help Desk "in title only, as he still physically remained in the exact same place he was prior to the supposed change."  (Pl.'s Aff. ¶ 12 n. 24, Ex. A to Pl.'s Reply to Def.'s Resp. to Pl.'s Mot. [hereinafter "Pl.'s Reply"].) He still participated in staff meetings on Tuesdays and Thursdays, had full interaction with the staff, and had an office in the same work area.  (*Id.*)  Plaintiff asserts that this was extremely stressful and awkward for her, as she was still in the same environment with the person who was retaliating against her for bringing the complaint about the Potts drawing and the person who had tendered his resignation because she had raised this complaint.  (*Id.*)  As a result, Plaintiff asserts that she continued to be treated differently and was ostracized by her co-workers as the "troublemaker" who caused this to happen to Russ, Paul and Desiree.  (*Id.*)

In place of Mr. Friesen, Ms. Brooks assigned Jason McRoy to the position of Interim Supervisor of the Help Desk Team.  He became the supervisor on August 3, 2006.  Mr. McRoy was new to the agency.  (Brooks' Depo. at 109, Pl.'s Ex. E.)  He did not have an extensive supervisory background, but had extensive experience in CBMS.  (*Id*. at 120.)  That is why Ms. Brooks put Mr. McRoy in as the Interim Supervisor of the Help Desk.  (*Id.* at 109, 120.)  Ms. Brooks also testified at one point that Mr. McRoy "was a brand-new supervisor."  (*Id.* at 44.)  Mr. McRoy received no special training in employee discipline, discrimination issues or supervisory training.  However, Valerie Brooks stated that he would have taken new employee orientation which "covers those types of things."  (*Id* at 122.)

The impact of the staff changes (firing of Mr. Potts and Ms. Renaud and reassignment of Mr. Friesen) was the taking away of three long-term employees.  (Pl.'s Aff. ¶ 15, Ex. A to Pl.'s Reply.)  While Vince Dixon and Kim Chiarello were temporarily assigned to the Help Desk to assist and Mr. McRoy was hired, Plaintiff testified that the reality is that there was an increased workload after these changes.  (*Id.*)  Plaintiff's personal workload significantly increased.  (*Id.*)

On August 2, 2006, there was a follow up witness interview of Plaintiff by Ms. Dixon.  The interview notes indicate that Plaintiff was complaining that Mr. Friesen treated her in a hostile and retaliatory manner on that date.  (Def.'s Ex. E at 110.)

Also on August 2, 2006, Plaintiff sent an email to Mr. Friesen stating, "This morning you referred to me as Ms. Doyle, as I said to you, from the entire time I have worked for you, you have NEVER referred to me as Ms. Doyle. . . .you have almost

-14-

ALWAYS called me Celeste; unless you refer to me by a more endearing name like

Hon, Sweetie or dear. . . . if for some reason you feel a need to begin to treat me

differently in any way than you have always treated me, then perhaps, you and I and

HR, can have a sit down meeting and discuss why."  (Pl.'s Ex. B at 86.) It continued:

> If not, please continue to call me the names you have always called me,
> refer to me by the greetings you have always referred to me and please,
> please, by all means do not treat me any differently now than you treated
> me in the past with reference to greeting.  And Please, do not make an
> effort to treat me any differently than you have with any of the other team
> members.

(*Id.* at 87.)

On August 3, 2006, Mr. McRoy's first day, Plaintiff sent him an email advising of

a telephone call from DDHS worker Annette Arden complaining about the service that

Plaintiff had provided.  The telephone log entry stated the following complaint about

Plaintiff:

> This is the second time I've spoken to you, you specifically and you don't fix
> my cases and you never help.  I don't need you to tell me if I don't know the
> answer to ask someone in my unit or my supervisor for help, that's what you
> told me before.  Well the client is in the lobby and she has cerebral palsy and
> I need help now; this client did not get her benefits and she should not have
> to wait.

Following this complaint, and at Mr. McRoy's request, Plaintiff began sending

Mr. McRoy draft responses for approval before responding to Help Desk inquiries.

(McRoy Aff., ¶ 6, Def.'s Ex. C [hereinafter "McRoy Aff."].)  He reviewed quite a few draft

responses of Plaintiff.  (*Id.* ¶ 7.)  Mr. McRoy stated in his affidavit that he believed,

based on Plaintiff's training and experience, that she should have been able to resolve

Help Desk inquiries without running draft responses by him.  (*Id.* ¶ 8.)

Also on August 3, 2006, one day following the active period of Defendant's investigation, Plaintiff emailed the Director of the HR office, Jennifer Fairweather, and her assistant, Tamara Tyler.  The email complained of ongoing conduct against her by Russell Friesen, including the fact that he just waited for Plaintiff to take certain action "so he would try to have something to harass me about" and that she "thought it might be necessary to include it with [her] previous written statement" to Ms. Fairweather for her records."  (Pl.'s Ex. D, Pl.'s Reply.)  Plaintiff testified that she received no response to this email and no communication from the Human Resources office addressing her complaint.  (Pl.'s Aff. ¶ 16, Ex. A to Pl.'s Reply.)

On August 8, 2006, Valerie Brooks officially notified Russell Friesen that disciplinary action (including dismissal) was being contemplated against him for "alleged conduct which may have resulted in one or more Career Service rule violations".  (Pl.'s Ex. G.)  This included, *inter alia*, alleged discrimination as well as retaliation against Plaintiff for being a witness to the complaints against Paul Potts, as well as allegedly providing false information during the investigation.  (*Id.*)  The letter set up a pre-disciplinary meeting on August 24, 2006, to permit Mr. Friesen to "correct any errors in the Agency's information or facts, to tell your side of the story and to present any mitigating information as to why possible disciplinary action should not be taken."  (*Id.*)  On August 9, 2006, Russell Friesen submitted his letter of resignation.  (Pl.'s Ex. H.)

On August 10, 2006, the final internal Investigation Report of the allegations of discrimination and retaliation raised by Celeste Doyle was completed by Tamara Dixon and formally released to various persons, including Valerie Brooks.  (Pl.'s Ex. B; Def.'s

Ex. E.)  Plaintiff claims that the Investigation Report confirmed that Plaintiff was

discriminated against and suffered from retaliation in the workplace by her supervisor

and fellow employees.  The actual findings of the report, in relevant part, are as follows:

> 1. The investigator finds it more likely than not that Paul Potts drew and gave to Celeste Doyle a drawing that she and Russell Friesen deemed either demeaning, racist and/or discriminatory.

> 2. The investigator finds it more likely than not that Ms. Doyle is (was) being treated differently by her team members, including her supervisor Russell Friesen.

> 3. This investigator finds it less likely than so that Paul Potts, while using his cell phone outside of Technology Services, made the remark "yeah, all they hire here anymore are monkeys and niggers."

> 4. This investigator finds it more likely than not that Mr. Friesen was not accurately tracking the time of his non-exempt employees, that time sheets for Desiree Renaud, Paul Potts, Celeste Doyle and Betty Roney were falsified by their signatures and the signature of Russell Friesen, and that each worker was paid for time they did not work.

> 5. This investigator finds it more likely than not that Ms. Doyle has been the subject of retaliation for being a witness to a claim of racial discrimination.

(Pl.'s Ex. B at 88-89.)

Under the Conclusion section of the Investigation Report, the investigator stated:

> This investigator has addressed the initial complaint of racial discrimination. The information gathered pursuant to investigating that claim has indicated that Russell Friesen failed to meet the standards of performance of a supervisor by failing to bring the discrimination allegation to Human Resources, failing to address his subordinate's complaint of the team treating her in an adverse way, falsified by his signature the timesheets of four of his employees, and engaged in behavior that is considered retaliation toward his subordinate.

(*Id.* at 89.)

The Investigation Report addressed numerous allegations, including an allegation that as Plaintiff's teammembers and supervisor Mr. Friesen became aware of the investigation, they engaged in retaliatory behavior towards her.  (Pl.'s Ex. B at 86.) After discussing supporting and refuting information, Ms. Dixon commented as follows:

> There is adequate corroborating information provided by Russell Friesen that at least he has engaged in retaliation against Ms. Doyle for being a witness to this investigation. During Mr. Friesen's interview with this investigator and Ms. Fairweather, he stated "...[it is] a very good team environment in my opinion...[Celeste and I] have had a good relationship...She was having a difficult time fitting in with the team because technically she is not astute. I had complaints from Desiree about Celeste...I did not follow-up with that and have it on my 'to-do' list to go over technical procedures with Celeste. But Celeste is new and needs to be given some time."
>
> However shortly after being interviewed Mr. Friesen spoke with Deputy Manager Valerie Brooks about Ms. Doyle's performance issues and his inability to continue supervising or work with her.  This is contrary to what he told this investigator and Ms. Fairweather. In addition, when asked what his tone with Ms. Doyle was when he came into the office on July 27, 2006, Mr. Friesen replied "My tone was moderately upset..."

(*Id.* at 88.)

"Relative to Ms. Doyle's concern that Mr. Friesen is accessing her sent emails", the investigator found it questionable that in an email sent from Desiree Renaud's personal email account on August 4, 2006 to DDHS Manager Roxane White, Ms. Renaud states, "Celeste's immaturity will cause her to do silly things like copy you on all of her e-mails because she thinks that's the appropriate process."  (Pl.'s Ex. B at 88.)  Additionally, Ms. Dixon stated that "Ms. Renaud purposefully attacks Ms. Doyle's performance" and "in said email, Ms. Renaud appears to have first-hand knowledge of this investigation."  (*Id.*)  She noted that "[w]hile Mr. Friesen may not have access to

Ms. Doyle's emails, it is more likely than not that confidentiality has been violated." (*Id.*) Thus, she found it was more likely than not "that Ms. Doyle is being retaliated against for being a witness to this investigation." (*Id.*)

Defendant's Investigation Process is detailed in Exhibit I to Plaintiff's Motion. The process specifies that upon completion of the investigation, the investigator was to send notices of completion to all the parties involved and that DDHS' Division Director, Deputy Manager or Department Manager was to send a final completion letter to the complainant and the accused.

The City and County of Denver's Code of Conduct—Rule 15-104— states that if an investigation concerning the subject of harassment or discrimination is necessary, "it will be completed and a determination will be made and communicated to the employee as soon as practicable." (Pl.'s Ex. S.)  Ms. Brooks also testified that HR would let the person who is the victim of discrimination know the outcome of that investigation. (Brooks' Depo. at 103, Pl.'s Ex. E.)

In early August of 2006, Plaintiff testified that she asked Ms. Dixon about the status of the investigation and if she could have a copy of the report.  (Pl.'s Aff. ¶ 13, Ex. A to Pl.'s Reply.)  In response, Ms. Dixon advised Plaintiff that the matters had been referred to DDHS management for further actions.  (*Id.;* Dixon Aff. ¶ 28, Def.'s Ex. B.) She did not inform Plaintiff that the investigation was complete.  Plaintiff assumed that the investigation was ongoing and that she would at some point be informed of the results.  (Pl.'s Aff. ¶ 13.)

Despite the mandates of Rule 15-104, DDHS' own Investigation Process requirement that notices of completion of the Investigation Report be sent to all parties involved, and the requirement that a final completion letter be sent by deputy manager Valerie Brooks (or her manager Roxane White) to the complainant and the accused, Plaintiff was never sent any of these documents or information.  Indeed, while Plaintiff was employed by DDHS, she was not given any information about the status of the investigation or the results.

When asked during her deposition why she did not communicate the results of the internal investigation to Ms. Doyle (despite her Code of Conduct requirement to do so), Ms. Brooks defiantly stated, *"No. I did not." "No. That's an HR function." "I would not be the person to inform her of the results of the investigation."*  In fact, Plaintiff received no communication about the results and findings of the investigation of her complaints of discrimination and retaliation until December 2010, when discovery was provided by DDHS to her counsel in this lawsuit.  (Pl.'s Aff. ¶ 22, Ex. A to Pl.'s Reply.)

Further, while Ms Brooks testified that counseling is available to the employee for support if she requested it (Brooks' Depo. at 103-05, Pl.'s Ex E), Ms. Brooks did not refer Plaintiff to counseling as she said Plaintiff was already working with HR.  (*Id.* at 105-106.)  Plaintiff was also not offered counseling.

On the same day the Investigation Report was formally released internally among DDHS' leadership—August 10, 2006—Ms. Doyle (assuming the investigation was still in progress) emailed the Human Resources office with a complaint that confidential documents from her computer were being printed somewhere else in

another location outside of her work area.  (Pl.'s Aff. ¶ 25, Ex. A to Pl.'s Reply.)  She spoke to her new supervisor, Jason McRoy, and the DDHS Information Systems Technology Department about the problem.  (*Id.*)

On August 16, 2006, Plaintiff sent Mr. McRoy a draft response that he stated demonstrated the following to him:  1) Plaintiff did not understand the problem presented by the DDHS worker; 2) the draft response did not help the DDHS worker; and 3) the draft response showed poor communication and problem solving.  (McRoy Aff. ¶ 8 and Email Attachment # 2.)  He thought the draft response was long and convoluted and did not address simple and specific solutions to address the particular problem.  (*Id.*)  He stated in his email response to Plaintiff that, "When you have some time, let's talk through this case a bit so we can sort out all of the different things going on with it.  Its not appearing as simple as "go directly to Jail do not pass go or collect $200."  (Email Attachment # 2 to McRoy Aff.)

On August 17, 2006, Plaintiff sent Mr. McRoy an email stating that she was sorry he was left with the understanding that she was changing things in the CBMS inbox without his approval and that she was not doing so.  She stated that she would like to change the way that she works the inbox, by not keeping both a paper and an E-copy of the same email.  (Attachment # 3 to McRoy Aff.)  She also stated that she had thought it was okay for her to come up with a better way to manage the inbox and had called IST to ask them if there was a way to remove the duplicate named folders but that this was "on hold" until further notice from him.  (*Id.*)  She told Mr. McRoy she would not do anything further until she heard from him.  (*Id.*)  Prior to August 17th, Mr. McRoy had

talked with Plaintiff about the need for process changes, but said he wanted to study the processes first and get input from other members of the Help Desk team before making changes.  (McRoy Aff., ¶ 16.)

Also on August 17, 2006, Plaintiff, again assuming the internal investigation was still ongoing, emailed Mr. McRoy about new and further retaliation she was experiencing in the form of what she described as, *"COLLUSION TO GET OTHER EMPLOYEES TO DISCRIMINATE AGAINST ME"*:

> I was just informed by Lewis Momanyi that Holly Zuhse and Victoria Prochaska told him and other employees, 'Stay away from Celeste. Celeste is a troublemaker, and that Celeste is the reason that people are leaving the IT department.'
>
> This is a clear attempt at continuing bullying; discrimination, harassment and a collusion effort to retaliate against me in the workplace. I just spoke with Tamara on the telephone, while Lewis was at my desk; and she told me to give this information to you.

(Pl.'s Ex. K; Attachment 7 to McCroy Aff.)

Plaintiff sent Mr. McRoy another email on August 17, 2006, entitled, "CONTINUED COLLUSION BY VICTORIA PROCHASKA TO GET OTHER EMPLOYEES TO DISCRIMINATE AGAINST ME".  (Attachment 8 to McCroy Aff.)  It stated, among other things, that Shirley Claire had come to Plaintiff's cubicle and informed her that someone had brought it to her attention that Plaintiff had allegedly told an Adult Medical technician that CBMS automatically shuts down for no apparent reason and that this would be an incorrect statement.  (*Id.*)  Plaintiff assumed in the email that this was probably told to Ms. Claire by Victoria Prochaska "because she has been going around this building telling a lot of people that I do not know how to do my

job and I don't know what I'm doing and to stay away from me because I am a trouble maker; ever since I complained about her unprofessional behavior." (*Id.*)

Mr. McRoy was concerned about the email regarding alleged collusion by Victoria Prochaska because Plaintiff did not address the issue raised by Ms. Claire— whether Plaintiff had given a DDHS employee incorrect information. (McRoy Aff., ¶ 19.) Instead, he thought Plaintiff found it more important to speculate about where the information had come from. (*Id.*)

Mr. McRoy did not reply to Plaintiff's August 10th or August 17th emails about her concerns that her confidential email communications were being compromised and the retaliation she was experiencing. Mr. McRoy did come and look at Plaintiff's computer about a printing problem. DDHS asserts that the employees referenced above in Plaintiff's email (Plaintiff's Exhibit K) are employees of TravCo, not DDHS, and that it had no duty to investigate complaints about those employees. Plaintiff asserts in response that these employees are contract employees for DDHS who are embedded throughout the department and were practically indistinguishable in their communications, interaction and conduct from other employees. (Pl.'s Aff. ¶ 15 n. 25, Ex. A to Pl.'s Reply.) Again, this appears to be a genuine issue of material fact.

Moreover, DDHS did not investigate these new complaints of retaliation, discrimination and harassment by the TravCo employees, or otherwise act to stop the conduct. This is despite the fact that the City and County of Denver's Code of Conduct Rule 15-104 required DDHS to *"immediately undertake effective, thorough, and*

*objective steps concerning the allegation of harassment or discrimination."* (Pl.'s Ex. S.) Plaintiff received no word that her complaints were being resolved.

Based on his review of Plaintiff's draft responses to Help Desk inquiries and his conversations with her regarding those inquiries, Mr. McRoy stated in his Affidavit that he believed Plaintiff's technical skills were weak. (McRoy Aff. ¶ 20.) Thus, on August 21, 2006, Mr. McRoy sent an email to Plaintiff about a CBMS training class for supervisors that he wanted her to enroll in. (*Id.*, ¶ 22.) He thought that she would benefit from the class. (*Id.*, ¶ 24.)

On or about August 23, 2006, and despite the findings of the Investigation Report, Plaintiff was required to attend the luncheon "going away" party for Russell Friesen. Attendance was made mandatory for CBMS Help Desk team members. (Pl.'s Aff. ¶ 30, Ex. A to Pl.'s Reply.)

On September 7, 2006, Ms. Doyle successfully completed her CBMS Supervisory Training.

Also on September 7, Mr. McRoy received an email from DDHS worker Lucinda Ogidan indicating that she had sent an email inquiry to the CBMS Help Desk on September 2 and had not received a response. (McRoy Aff., ¶ 25 and Attachment 10.) According to him, this issue became "the straw that broke the camel's back" because Plaintiff "was responsible for checking the Help Desk inbox and had failed to respond to the inquiry or take any action on it." (McRoy Aff., ¶ 25.)

Plaintiff's Affidavit explains her version of what happened in connection with Ms. Ogidan's email inquiry. She stated that multiple people were responsible for

checking the CBMS Help Desk inbox, and that this was not solely her responsibility (Pl.'s Aff. ¶ 41, Ex. A to Pl.'s Reply.)  She says there were two email boxes -- the official box and a duplicate inbox which was supposed to be inactive and was not regularly checked.  (*Id.*)  Email messages were occasionally being deposited in the duplicate inbox, and this is what originally happened with Ms. Ogidan's email.  (*Id.*)  Plaintiff further states that the Ogidan original email was sent on Saturday, September 2, 2006.  (*Id.*)  The CBMS Help Desk was not open on the weekends.  (*Id.*)  Her second email was sent on September 7, 2006.  (*Id.*)  During that week, Plaintiff was in the midst of an offsite supervisor training class that Mr. McRoy authorized her to attend and which she completed on September 7, 2006.  (*Id.*)  However, as Defendant points out, Plaintiff emailed Mr. McRoy on September 5, 2007, that she "completely cleaned out the cbms help box inbox" since she would not be there for the next couple of days."  (Attachment 3 to McRoy Aff.)  Finally, Plaintiff asserts in her Affidavit that Ms. Ogidan was not upset or angry and readily acknowledged that she sent the message to the wrong inbox. (Pl.'s Aff. ¶ 41, Ex. A to Pl.'s Reply.)  Plaintiff stated that upon her return back to the office, she solved Ms. Ogidan's concerns.  (*Id.*)

That same day, September 7, 2006, Mr. McRoy forwarded Ms. Ogidan's email to HR Analyst Deb Arter and also left a voice message asking Ms. Arter for advice.  They exchanged emails wherein the subject of terminating Celeste Doyle was discussed. (Attachment 10 to McRoy Aff.)  Mr. McRoy stated in the emails that Plaintiff was the one responsible for covering the Help Desk email inbox, that it should have been routed to the state and a ticket number given to the worker.  (*Id.*)  He also stated that Plaintiff had

not turned her log in for the last month, and that he had to remind her about this last month as well. (*Id.*) Ms. Arter responded that she and Jennifer had both reviewed the information and, "coupled with this new information, it is certainly appropriate for you to have a conversation with Valerie [Brooks] to discuss ending probation." (*Id.*) She also stated that she "would be more than happy" to meet with him and Valerie "about the performance, leave, behavior issues" and that "[s]ince your employee is on probation, . . . progressive discipline is not an option." (*Id.*) When Mr. McRoy stated he would talk to Plaintiff (presumably about possible termination), Ms. Arter responded with an excited affirmation, "HR supports you!" (*Id.*)

On September 8, 2006, Mr. McRoy states that he observed Plaintiff was still working at 5:00 p.m. and that he did not authorize her to work beyond her 8:30 a.m. to 4:30 p.m. shift on that day. (McRoy Aff., ¶ 28.) Plaintiff disputes this in her Affidavit, stating that if overtime was recorded, this was consistent with Mr. McRoy's guidelines, not despite his directions. (Pl.'s Aff., ¶ 41, Ex. A to Pl.'s Reply.)

Plaintiff also stated in her Affidavit that Mr. McRoy's overtime and shift hours policies were not rigid, and he was reasonable and flexible. (Pl.'s Aff., ¶ 40, Ex. A to Pl.'s Reply.) He recognized that family, medical and other considerations could arise that required flexibility in the policy. (*Id.*) Plaintiff asserts that he simply asked that he be advised in advance of any problems with the schedule, or as soon as possible afterwards, if the employee was unable to notify him in advance. (*Id.*) Plaintiff also stated that there was flexibility in his time requirements as to when Plaintiff turned her call logs in. (*Id.*) Plaintiff asserts that Mr. McRoy fully understood the pressures the

-26-

employees were under with the workload and being short-staffed, and he'd just say, *"ok, just give it to me in a couple of days."* (*Id.*)

On September 11, 2006, just four days after completing her CBMS Supervisor Training, Valerie Brooks approved the termination of Plaintiff's employment. (McRoy Aff., ¶ 30.) Whether she also authorized the termination, *i.e.*, was involved in the decision to terminate Plaintiff, is disputed. DDHS asserts that she was not involved, that Mr. McRoy alone made this decision. Indeed, Mr. McRoy testified that he made the decision to terminate Plaintiff's probationary employment, that he discussed it with Ms. Brooks, and that she agreed with his decision. (*Id.*, ¶¶ 29, 30.) Plaintiff asserts that Ms. Brooks was involved, and authorized the termination. This appears to be a genuine issue of material fact because Ms. Brooks' deposition testimony on this issue is unclear.

Supporting Plaintiff's assertion that Ms. Brooks was involved in the decision to terminate her, Ms. Brooks testified that she did not consult with anybody else "in making the decision to terminate Celeste Doyle." (Pl.'s Ex .E at 111.) She testified in response to "what day" she "decided to terminate Celeste Doyle, "I don't recall the exact date. It would have been about the time period." (*Id.* at 119.) Also, Plaintiff's counsel asked, "Once you made the decision to fire Celeste Doyle, you discussed that with her manager." (*Id.* at 97.) Ms. Brooks responded, "When she was terminated – and as said before, it's something I would have informed my manager of before she was terminated." (*Id.*) This testimony supports an inference that she was involved in, and authorized, the decision to terminate Plaintiff.

On the other hand, Ms. Brooks testified in her deposition that she "wasn't the one who made the final decision to terminate her. The supervisor made the decision and I approved it." (Brooks' Depo. at 119, Pl.'s Ex. E.)  She states the same thing at other points in her deposition.  (*Id*. at 42-42, 87, 63-64.)  Also, in response to an inquiry whether Mr. McRoy could not have terminated Plaintiff's employment without her authorization, Ms. Brooks said, "No, I wouldn't say that." (*Id*. at 42.)  She went on to say, "I don't think there's any formal requirement, like, in the CSA rules."  I mean, it doesn't have to go through the deputy.  I mean, every termination doesn't go through a deputy manager." (*Id*.)  This supports Defendant's assertion that she did not make the termination decision.

Regardless of whether she "made the decision to fire" Plaintiff, Ms. Brooks certainly approved the decision.  (McRoy Aff., ¶ 30.)  In so doing, Ms. Brooks admits that she did not review Plaintiff's personnel file, nor did she ever ask to review her personnel file.  (Brooks' Depo. at 112-113, Pl.'s Ex. E.)  That is because it was Plaintiff's supervisor's responsibility to monitor her performance, and that is something her supervisor would have maintained.  (*Id*. at 113.)  Further, she was not aware of the fact that Ms. Doyle had just completed supervisor training.  (*Id*.)  Additionally, although stating that she was made aware of "performance issues" related to Plaintiff by Mr. Friesen and Mr. McRoy, Ms. Brooks had no recollection at her deposition as to what these alleged "performance issues" were about or otherwise related to.  (*Id*. at 37-38, 112-13, 119, 163-64.)

Mr. McRoy signed Plaintiff's termination letter.  He testified that he made the decision to terminate Plaintiff's probationary employment based on her performance. (McRoy Aff., ¶ 29.)  He said he had received complaints about the service Plaintiff provided on the Help Desk, she did not follow his directions, she did not demonstrate the ability to function as a member of a team, she should have been able to resolve Help Desk inquiries without constantly running draft responses by him, her CBMS technical skills were weak, she demonstrated poor communication and problem-solving skills, and she failed to respond to the Help Desk inquiry on September 2, 2006.  (*Id.*)

Mr. McRoy testified that when he made the termination decision, he did not know Plaintiff had made a complaint about a co-workers' drawing (by Mr. Potts).  (McRoy Aff. ¶ 34.)  He also did not know the HR department had investigated Plaintiff's complaint about the drawing or that Plaintiff had been interviewed by HR about the complaint. (*Id.*)  Although he admits he knew about an HR investigation, he testified he thought that was about Mr. Friesen's recordkeeping practices.  (*Id.* ¶¶ 33-34.)  Plaintiff disputes this, asserting in her affidavit that Mr. McRoy did know about the investigation of her complaints of retaliation and discrimination.  (Pl.'s Aff. ¶¶ 12, 14, Ex. A to Pl.'s Reply.) Again, this appears to be a disputed material fact.

Mr. McRoy also stated in his affidavit that while he knew Plaintiff is African-American, he did not know that she is also Hispanic.  (McRoy Aff., ¶ 32.)  However, Plaintiff asserts in her Affidavit that she told him she was Hispanic (Pl.'s Aff., ¶ 38, Ex. A to Pl.'s Reply).  Defendant stated in its reply that it does not dispute Plaintiff's assertion

that she told Mr. McRoy she was Hispanic for purposes of summary judgment.

Ms. Brooks believed that Plaintiff was African-American.

On September 11, 2006, to her surprise, Ms. Doyle received notice via a letter

from Jason McRoy that "the Agency anticipates that you will fail to pass employment

probation for your position...."  (Pl.'s Ex. M.)  That letter gave no reason for this finding.

The letter also stated:

> "The meeting is scheduled for 7:30 a.m. on Wednesday September 13, 2006
> to discuss this matter. Please report to the first floor security desk by 7:30
> a.m. as the meeting will take place in an office on the first floor. **You may
> present a written and/or verbal statement at this meeting. Your
> statement and any relevant information from your file will be given full
> consideration before a final decision is made regarding your probation.**
>
> **Please note, no decision regarding any action has been made nor will
> be made until the meeting has been completed**."

(*Id.*) (emphasis added).

On September 13, 2006, Plaintiff arrived for the meeting at which Valerie Brooks

and Jason McRoy were present.  (Pl.'s Aff., ¶ 33, Ex. A to Pl.'s Reply.)  According to

Plaintiff, Ms. Brooks conducted the meeting and was the only person to substantively

speak to her.  (*Id.*)  Ms. Brooks stated that she attended the meeting only because

Mr. McRoy was a new supervisor at DDHS who had not been hired to supervise the

CBMS Help Desk and she thought it was not fair for him to have to deliver the

termination letter himself.  (Brooks' Depo. at 42-44, 88, Def.'s Ex. F.)

Upon the start of the meeting, Ms. Doyle began to present her statement and

relevant information from her file to Ms. Brooks and others present about why she

should pass employment probation.  (Pl.'s Aff. ¶ 33, Ex. A to Pl.'s Reply.)  However, she

was stopped from doing so, and was informed by Ms. Brooks that the decision to terminate her employment had already been made and that she would not be entitled to present any statement or information.  (*Id.*)  Ms. Brooks testified that she did not remember what happened at the meeting.  (Pl.'s Ex. E at 112.)

Plaintiff was given no reason for her termination despite her multiple questions during this meeting about why this was happening.  (Pl.'s Aff. ¶ 34, Ex. A to Pl.'s Reply.) At the end of the short meeting, Ms. Brooks handed Plaintiff a letter stating, "This separation during probation is the result of unsatisfactory job performance."  (*Id.*; Pl.'s Ex. N.)

When asked at her deposition whether it crossed her mind that her conduct in terminating [Plaintiff's] employment would be viewed as retaliation for having filed a complaint related to Paul Potts' conduct in making the drawing in the first place, Valerie Brooks said, "I have no idea what I thought back then. Honestly. I mean, it was 2006. Honestly, I have no idea what I was thinking then."  (Pl.'s Ex. E at 169.)

Despite the job performance evaluation process of DDHS as described by Ms. Brooks (and discussed previously), Plaintiff testified that (1) she did not receive any formal verbal counseling or other communications with her supervisors indicating performance problems; (2) there was no meeting held with Plaintiff to discuss performance issues; (3) Plaintiff was not provided an opportunity to correct any performance problems; (4) she did not have discussions with her supervisors concerning complaints about her performance; and (5) she was not given time to resolve any alleged problem or to improve.  (Pl.'s Aff. ¶ 36, Ex. A to Pl.'s Reply.)

Further, DDHS admitted in discovery that "[b]etween May and September 2006, the Department did not receive any complaints about the conduct of any member of the CBMS Help Desk Employee [which obviously includes Plaintiff], except for the complaint about Paul Potts' drawing."  (Pl.'s Ex. Q, p. 3 answer 21.)[3]

In response, DDHS points to Mr. McRoy's statement that he talked to Plaintiff on several occasions stressing that she needed to work her scheduled 8 hour/day shift and that she could not work overtime without prior approval.  (McRoy Aff. ¶ 10.)  He also stated that despite his instructions, Plaintiff worked overtime without his prior authorization and DDHS was required to pay the overtime.  (*Id.* ¶ 11.)  Further, he testified that Plaintiff did not turn in her monthly telephone logs in a timely manner, so he sent her email reminders in August and September 2006.  (*Id.*, ¶ 13.)  Finally, he testified that before August 17, 2006, he had talked with Plaintiff about the need for process changes.  (*Id.*, ¶ 16.)  These talks do not, however, appear to rise to the level of a formal verbal counseling about performance problems.  At the very least, there is a genuine issue of material fact about this issue.

As to Plaintiff's assertion that she did not have discussions with her supervisors concerning complaints about her performance, Defendant points to Mr. McRoy's testimony that Plaintiff emailed him a complaint about her from DDHS Annette Arden. DDHS has not, however, pointed to any actual discussions that Plaintiff had with her supervisors regarding her performance.  Plaintiff points out that DDHS' citation to this

---

[3] Defendant claims that the "conduct" discussed in this discovery answer does not include job performance.  That is not at all clear from the discovery response and, again, appears to be a genuine issue of material fact.

email as an example of complaints about her performance is misplaced and factually inaccurate, as "the CBMS Help Desk is a problem magnet."  (Pl.'s Aff. ¶ 39, Ex. A to Pl.'s Reply.)  The purpose of the Desk is to "help" deal with and resolve problems being experienced by others.  (*Id.*)  Plaintiff testified that the mere fact that someone experiences a problem or gets upset with a Help Desk Employee does not translate to a complaint about job performance.  (*Id.*)  Ms. Arden's complaint was resolved, she tendered no complaint with Plaintiff's supervisors, and DDHS did not receive any complaints about Plaintiff's conduct as a Help Desk Technology Technician II.  (*Id.*)  Plaintiff testified she handled hundreds of calls, emails, consultations and complaints from July to September of 2006, and received compliments and commendations.  *Id.* Again, there appear to be genuine issues of material fact on this issue.

One of Plaintiff's original co-workers on the CBMS Help Desk Team—Betty Rooney—was allowed to pass probation and went on to become a career service employee for Defendant.  Ms. Rooney is Caucasian.  (Pl.'s Ex. Q, p. 4 answer 24.)

On April 25, 2007, Plaintiff filed a complaint with the Equal Employment Opportunity Commission ["EEOC"] alleging that her termination was based upon discrimination, national origin, disability, sexual and racial harassment/hostile work environment and retaliation for reporting discriminatory acts to the Human Resources Department in violation of Title VII.  (Pl.'s Ex. O.)

In her deposition, Plaintiff was asked whether she is claiming in this lawsuit that Mr. McRoy retaliated against her for any reason when she was terminated.  (Pl.'s Depo. at 309, Ex. 2 to Def.'s Resp. to Pl.'s Mot. ["Def.'s Resp."].)  She answered, "No, I'm not."

(*Id.*; *see also* Pl.'s Depo. at 383, Ex. E to Pl.'s Reply.)  She then stated she would like to

"restate and change" her previous answer.  (Pl.'s Depo at 383.)  Thereafter, she stated

as to whether Mr. McRoy "discriminated specifically", that she did not know if he

discriminated against her at the direction of his supervisors.  (*Id.*)  She further stated,

"All I do know is that I was terminated after filing a charge of discrimination, after racial

comments, after the investigation, and after things took place –".  (*Id.*)

Also in her deposition, Plaintiff was asked whether she is claiming in this lawsuit

that Valerie Brooks retaliated against her for any reason when she was terminated.

(Pl.'s Depo. at 309, Ex. 2 to Def.'s Resp.)  She answered, "No, I am not.  I would only

include those persons in my retaliation claim if they  took part in the decision to

terminate me. . . ."  (*Id.*)  Later in her deposition, when asked if Valerie Brooks

discriminated against her on the basis of racial or national origin, she said, "I do not

know."  (Pl.'s Depo. at 383, Ex. E to Pl.'s Reply.)  She went on to testify that the persons

who discriminated against her were "the persons responsible for my termination",

"whomever was responsible for the decision."  (*Id.* at 377, 379.)  She also stated, "[t]he

act of termination itself is an act of retaliation."  (*Id.* at 379.)

On October 1, 2009, Plaintiff received a right to sue letter from the EEOC.  On

December 31, 2009 this lawsuit was filed.

III.    ANALYSIS

    A.    Standard of Review

Summary judgment may be granted where "the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and the ... moving party is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(c).  The burden of showing that no

genuine issue of material fact exists is borne by the moving party.  *E.E.O.C. v. Horizon/*

*CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000).  The court must view the

evidence in the light most favorable to the nonmoving party on review of a summary

judgment motion.  *Anaya v. Crossroads Managed Care Sys., Inc.*, 195 F.3d 584, 590

(10th Cir. 1999).  All doubts must be resolved in favor of the existence of triable issues

of fact.  *Boren v. Southwestern Bell Tel. Co.*, 933 F.2d 891, 892 (10th Cir. 1991).

Since the parties filed cross motions for summary judgment, "'[the court is]

entitled to assume that no evidence needs to be considered other than that filed by the

parties, but summary judgment is nevertheless inappropriate if disputes remain as to

material facts.'"  *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138,

1148 (10th Cir. 2000) (quotation omitted).  I have treated the cross motions for summary

judgment separately, recognizing that the denial of one does not require the grant of

another.  *Buell Cabinet v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979).

      B.    Whether Summary Judgment is Appropriate

          1.    Discrimination on the Basis of Race and National Origin

DDHS argues in its motion that summary judgment is appropriate on Plaintiff's

claims of discrimination on the basis of both race and national origin.  It first argues that

Plaintiff failed to establish a prima facie case of discrimination.  Two other probationary

employees who worked with Plaintiff on the CBMS Help Desk were terminated in a time

period close to Plaintiff's termination, and they were both Caucasian.  Thus, it is argued

that Plaintiff cannot show that similarly situated non-minority employees were treated more favorably with regard to the termination of their probationary employment than Plaintiff. Further, DDHS argues that there is no evidence to support an inference that it terminated Plaintiff based on race or national origin. Finally, Defendant asserts that it offered legitimate non-discriminatory reasons for the termination of Plaintiff's employment, and Plaintiff failed to show pretext.

Turning to my analysis, since Plaintiff has offered no direct evidence of discrimination, the *McDonnell-Douglas* burden-shifting test must be applied to Plaintiff's claim of discrimination. *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1043 (10th Cir. 2011). To establish a prima facie case of discrimination based on race or national origin, a plaintiff must show that: (1) she belongs to a protected group; (2) she suffered an adverse employment action (in this case termination), and (3) the challenged action took place under circumstances giving rise to an inference of discrimination. *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007).[4] "Once the plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action." *Id.* "If the employer does so, the burden shifts back to the plaintiff to show that there is a genuine issue of material fact as to whether the employer's proffered reasons are pretextual." *Id.*

---

[4] Alternatively, a prima facie case of discrimination can be demonstrated by showing that: (1) the plaintiff is a member of a protected class, (2) she suffered an adverse employment action, (3) she was qualified for her job, and (4) plaintiff was treated less favorably than others not in the protected class. *Turner v. Pub. Serv. Co.*, 563 F.3d 1136, 1142 (10th Cir. 2009).

In the case at hand, Plaintiff failed to address the discrimination claim in any way in the summary judgment briefing.  Thus,  she may be conceding the claim.  Even if she is not conceding the claim, Plaintiff's failure to respond means that she failed to demonstrate a prima facie case as to the final element—that her termination took place under circumstances giving rise to an inference of discrimination based on race or national origin.  She also failed to demonstrate that she was treated differently than similarly situated employees, as noted by Defendant.

Further, even if I assume that Plaintiff could demonstrate a prima facie case of discrimination based on sex and/or national origin, Defendant demonstrated legitimate, nondiscriminatory reasons for her termination and Plaintiff failed to discuss or show pretext in connection with her discrimination claim.  Accordingly, I find that summary judgment is appropriate as to the discrimination claims based on race and national origin and grant Defendant's summary judgment motion as to same.

2.    Retaliation

Plaintiff claims two types of retaliation—that she was retaliated against through harassment by her co-workers and that she was retaliated against through her termination from employment.  To demonstrate a prima facie case of retaliation, a plaintiff must show that (1) she engaged in protected opposition to discrimination, (2) a reasonable employee would have found the challenged action materially adverse, and (3) a causal connection existed between the protected activity and the materially adverse action.  *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1228 (10th Cir.

2006).  I find for the reasons stated below that both parties' motions for summary

judgment should be denied as to this claim.

I first address Plaintiff's claim of retaliation in connection with her termination.

DDHS does not dispute that Plaintiff meets the first two elements of the prima facie

case.  Indeed, it is clear that Plaintiff engaged in protected activity.  Further, a

reasonable employee would find a termination of employment to be materially adverse.

Thus, the issue is whether Plaintiff has shown a causal connection between the

protected activity and her termination.  DDHS argues that she has not.  I disagree and

find that Plaintiff has established a prima facie case of retaliation based on her

termination.

First, I find that Plaintiff did not just complain about retaliatory conduct in her

interview with Ms. Dixon on July 24, 2006, as argued by DDHS.  She also made

complaints both before and after that which constitute protected activity.  *See Robbins*

*v. Jefferson County Sch. Dist. R-1*, 186 F.3d 1253, 1258 (10th Cir. 1999) (informal

complaints to supervisors or the use of the employer's internal grievance procedures

constitute protected activity).

Specifically, the Investigation Report reveals that "during the course of this

investigation", which was presumably after the date the investigation started on July 24,

Plaintiff "brought forth a claim of retaliation against Desiree Renaud and Russell Friesen

for being a witness to the complaints against Paul Potts."  (Pl.'s Ex. B at 79.)  On August

2, 2006, Plaintiff was interviewed again by Ms. Dixon who noted that Plaintiff was

complaining Mr. Friesen treated her in a hostile and retaliatory manner on that date.

Plaintiff also emailed her supervisor Mr. Friesen on that date complaining of being treated differently.  On August 3, 2006, Plaintiff emailed the Human Resources office complaining of ongoing conduct against her by Mr. Friesen.  Plaintiff also made complaints of ongoing retaliation to the HR Department on August 10, 2006, and to her new supervisor Mr. McRoy on August 17, 2006.  The decision to terminate Plaintiff was made on September 7, 2006, just two and a half weeks after Plaintiff's last complaint, and Plaintiff's termination letter was dated September 11, 2006.  Accordingly, I find that the temporal proximity of Plaintiff's ongoing complaints to the decision to terminate her supports a causal connection.  *See Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1228 (10th Cir.2008) (holding that close temporal proximity of two weeks between protected activity and termination was "alone sufficient to establish a causal connection"); *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir.2006) (holding that close temporal proximity of twenty-four days between plaintiff's complaint and his termination was sufficient to establish a causal connection).

DDHS also argues that Plaintiff has not demonstrated that the decision-maker, Mr. McRoy, had knowledge of the protected activity.  I reject this argument.  First, Plaintiff complained to Mr. McRoy of ongoing retaliation in her emails of August 17, 2006.  Second, I find that there is a genuine issue of material fact as to whether Mr. McRoy knew of the previous complaints about discrimination and retaliation and the investigation into same by DDHS.  Finally, I find that there is a genuine issue of material fact as to whether deputy manager Ms. Brooks, who clearly knew of all the protected activity, was involved in the decision to terminate Plaintiff.

Thus, I next consider whether DDHS presented a legitimate non-discriminatory reason for Plaintiff's termination and, if so, Plaintiff's evidence of pretext. DDHS asserts that Mr. McRoy made the decision to terminate Plaintiff's employment based on multiple performance issues that he outlined in his Affidavit and which are detailed in the facts. While Plaintiff questions why these reasons were not tendered by DDHS earlier, I nonetheless accept these tendered reasons for the termination for purposes of the summary judgment motions. Thus, Plaintiff must show pretext in order to survive summary judgment.

I find that Plaintiff has presented substantial evidence of pretext. A plaintiff may demonstrate pretext by showing "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" *Jones v. Okla. City Pub. Sch.*, 617 F.3d 1273, 1280 (10th Cir. 2010) (quotation omitted). Here, while DDHS states that Plaintiff was fired for "unsatisfactory performance", there is nothing in the employment file that indicates she was performing her duties in an unsatisfactory manner.

Further, some of the reasons given for Plaintiff's termination are not consistent with the discovery responses of DDHS. For example, while Mr. McRoy asserted as a reason for Plaintiff's termination that complaints were made about her performance, DDHS stated in its discovery responses that it did not receive any complaints about the conduct of any member of the CBMS Help Desk Team in the relevant time period.

-40-

Mr. McRoy also stated as a reason to terminate Plaintiff the fact that she worked overtime without permission and failed to turn in call logs.  However, DDHS stated in discovery responses that it did not fire any DDHS employees on the CBMS Help Desk for these reasons.

Finally on this issue, while Mr. Friesen allegedly told Deputy Manager Brooks about unsatisfactory performance on the part of Plaintiff, the investigator questioned the truthfulness of these complaints since she found them to be contrary to what Mr. Friesen had told the investigator and the Human Resources Department, where he indicated positive job performance by Plaintiff.  Ms. Brooks specifically referenced this in her letter notice to Mr. Friesen of contemplated disciplinary action where she stated:

> "10. You allegedly provided *false information* during the investigation. The results of the investigation indicated that you stated you and Celeste have a 'great relationship.' This directly contradicts the statement you made to me on August 1, 2006 where you stated that you 'could not work with her [Celeste] anymore.'"

Despite this confirmation of the falsity of claimed performance problems of Plaintiff by Mr. Friesen, Ms. Brooks admitted in her deposition that Plaintiff was terminated for performance problems that she was made aware of by, among others, Mr. Friesen. (Pl.'s Ex. E at 110).

Additionally, a plaintiff may show pretext by presenting evidence that an employer "acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances" or "acted contrary to an unwritten policy or company practice when making the adverse employment decision affecting the plaintiff." *Kendrick v. Penske Transp. Servs., Inc.,* 220 F.3d 1220, 1230 (10th Cir. 2000).  Here,

Plaintiff presented evidence that DDHS did not comply with its procedure stated in the end-of-probation letter to Plaintiff that she had a right to present a written and/or verbal statement about why she should be retained as a permanent employee, and that her statement and any relevant information from her file would be given full consideration before a final decision would be made regarding her probation.  The letter further noted that no decision regarding any action had been made nor would be made until the meeting had been completed.  Plaintiff presented evidence that when she appeared at the meeting prepared to present her reasons why she should be retained, she was summarily cutoff by Deputy Manager Brooks who informed that she would not be allowed to present any information and that the decision to terminate her had already been made.  This was followed by the handing to her of a pre-written letter stating that she was being terminated for unsatisfactory performance.

Further, deputy manager Brooks made it clear that despite the probationary status of an employee, DDHS has an formal unwritten policy in place for evaluating employee performance and deciding when a probationary employee should be retained or terminated.  Here, Plaintiff presented evidence that even though this policy was in place while she was a probationary employee, DDHS did not follow and comply with same.  Plaintiff was not, among other things, provided a meeting to discuss performance issues or an opportunity to correct any performance problems.  DDHS also did not comply with its policies that required it to notify Plaintiff, as the complainant, of the fact that the investigation had been completed and of its determination regarding the allegations that was favorable to Plaintiff.  Indeed, Plaintiff was terminated a few weeks

after the investigation had been completed without any notice of the investigation results or the fact that her allegations of ongoing retaliation were substantiated.

Based on the foregoing, I find that summary judgment is not appropriate as to the retaliation claim based on Plaintiff's termination as I find that there are genuine issues of material fact.  Accordingly, I turn to Plaintiff's claim of retaliation based on the harassment she suffered before she was terminated.  Specifically, Plaintiff pled in her complaint that she "has suffered from adverse employment actions" from "Defendant's subjecting her to continuing demeaning and humiliating conduct and treatment by her supervisor and co-workers".  (Compl., ¶ 29a.)

Turning to my analysis, a co-worker's "hostility or retaliatory harassment, if sufficiently severe, may constitute 'adverse employment action' for purposes of a retaliation claim."  *Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1265 (10th Cir. 1998).  "To be actionable, the alleged retaliatory harassment must be objectively and subjectively offensive, and 'must rise to some level of substantiality.'"  *Lujan v. Johanns*, 181 Fed. Appx. 735, 738 (10th Cir. May 25, 2006) (unpublished).  "Courts must mull the totality of circumstances and factors, including the frequency and severity of the harassment, whether it is physically threatening or humiliating, and whether it interferes with an employee's work performance."  *Id.* (citing *Noviello v. City of Boston*, 398 F.3d 76, 92 (1st Cir. 2005) (adapting hostile work environment standards set forth in *Faragher* to retaliatory harassment claims)).

If the hostility or retaliatory harassment of co-workers is sufficiently severe to qualify as an adverse action, an employer may be liable for such retaliatory harassment

if supervisory or management personnel either (1) orchestrated the harassment of the plaintiff by other employees, or (2) knew about the harassment and acquiesced in such a manner as to condone it." *McGowan v. City of Eufala*, 472 F.3d 736, 743 (10th Cir. 2006) (citing *Gunnell,* 152 F.3d at 1265). The record should "support a conclusion that harassment was orchestrated by supervisory personnel or that the City tacitly approved of it." *Id.*

I find in this case that there is sufficient evidence in the record to support a claim against DDHS based on co-worker hostility or harassment. First, I find that the alleged hostility or retaliatory harassment by Plaintiff's co-workers is sufficiently severe to constitute an adverse employment action for purposes of Plaintiff's retaliation claim. *See* Section III.B.3, *infra*. I also find that there are genuine issues of material fact as to whether Plaintiff's supervisors at DDHS acted with the intent to orchestrate, condone or encourage co-worker hostility or sexual harassment or at least tacitly approved of such harassment, particularly as to supervisor Russell Friesen. Therefore, summary judgment as to the retaliation claim based on co-worker hostility or harassment must be denied.

### 3. Hostile Work Environment

Finally, Plaintiff asserts a claim of hostile work environment. In order to establish that a hostile work environment exists in resisting summary judgment, a plaintiff must present evidence from which a jury could reasonably conclude that "(1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex [race or other protected status]; and (4) due to the

harassment's severity or pervasiveness, the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment." *Harsco Corp. v. Renner,* 475 F.3d 1179, 1186 (10th Cir.2007); *see also  Chavez v. New Mexico*, 397 F.3d 826, 831-32 (10th Cir. 2005).  General harassment is not actionable, the harassment must be based on race or sex. *Bolden v. PRC, Inc.*, 43 F.3d 545, 550 (10th Cir. 1994).

In making the determination whether the plaintiff has demonstrated a hostile work environment, the court must "consider the work environment 'both objectively and subjectively, . . . look[ing] at all the circumstances from the perspective of a reasonable person in the plaintiff's position.'"  *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007).  As to the subjective requirement, the plaintiff must subjectively believe that the conduct is so severe that it created an abusive or hostile environment. *Smith v. NW Financial Acceptance, Inc.*, 129 F.3d 1408, 1413 (10th Cir. 1997).

As to the objective component, the court must determine whether an environment is "hostile" or "abusive" by looking at the totality of the circumstances. *Smith*, 129 F.3d at 1413.  Factors that may be considered in determining whether the environment is hostile or abusive "include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys.*, 510 U.S. 17, 22-23 (1993).  Any relevant factor "may be taken into account, [but] no specific factor is required." *Id.* at 23.  Further, the court must "consider all the circumstances relevant to the discrimination to determine if

the conduct was sufficiently severe to constitute a hostile work environment", including "the setting and context in which the discriminatory behavior occurred." *Id.* at 1414.

I find that summary judgment should be denied as to this claim. Plaintiff presented evidence showing a significant number of racial comments by her co-workers. This includes the picture of her drawn by Mr. Potts that she and Mr. Friesen deemed either demeaning, racist and/or discriminatory, the evidence that Mr. Potts said on his cell phone, "yeah, all they hire anymore are monkeys and niggers", and the fact that Plaintiff's co-workers Ms. Renaud and/or Ms. Roney had a conversation in her presence where they called her the "N" word, "Spic", and "Hispanigger" (Pl.'s Dep. at 356, Def.'s Ex. G).[5]  She also presented evidence that there were significant ongoing complaints about her performance and being a troublemaker and that her co-workers were mean to her. Further, she cites to the Investigation Report which found that she was being treated differently by her coworkers, and that her rights of confidentiality had been violated related to her communication with supervisor Mr. Friesen.

I find that Plaintiff has presented evidence from which it can be inferred that she subjectively believed that this conduct created an abusive or hostile environment, as she continually complained of these actions. Further, as to the objective component, I find that a rational jury could find the work environment was "hostile" or "abusive. The

---

[5]  Plaintiff also testified in her deposition that Ms. Roney and/or Ms. Renaud made certain derogatory remarks directed at Hispanics when certain Hispanic girls were going to take a day off for Cinco de Mayo (May 6, 2006), including that the Hispanic race should be denied public benefits and should be treated differently than others within the American population and those that spoke English. (Pl.'s Depo. at 364, Ex. O to Def.'s Reply.)  She further argued in her response to Defendant's summary judgment motion that Ms. Roney "often expressed discriminatory, insulting and insensitive remarks to Plaintiff concerning Hispanics in the workplace".  (Pl.'s Resp. at 66.)

conduct complained of by Plaintiff appears to be relatively frequent, some of the conduct was severe and potentially humiliating, and there is evidence from which it could be inferred that this conduct unreasonably interfered with Plaintiff's work performance.  I also find that there are genuine issues of material fact as to whether these actions were targeted at Plaintiff because of her race or national origin.  Finally, I find that there are genuine issues of material fact as to whether DDHS, as the employer, took adequate remedial and preventative responses to any actually or constructively known harassment.

III.   CONCLUSION

Based upon the foregoing, it is

ORDERED that Defendant's Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**.  The Motion is **GRANTED** as to Plaintiff's claims of discrimination based on race and national origin.  The Motion is **DENIED** as to Plaintiff's retaliation claim and hostile work environment claim.  It is

FURTHER ORDERED that Plaintiff's Motion for Summary Judgment is **DENIED**.

Dated:  November 8, 2011

BY THE COURT:


s/ Wiley Y. Daniel
Wiley Y. Daniel
Chief United States District Judge